UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| AFRICAN ECONOMIC DEVELOPMENT SOLUTIONS,<br><br>Plaintiff,<br><br>v.<br><br>WEST BEND MUTUAL INSURANCE COMPANY,<br><br>Defendant. | Case No. 24-cv-459 (LMP/TNL)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Craig A. Buske and David L. Shulman, **Shulman & Buske PLLC**, Minneapolis, MN, for Plaintiff.

Kevin J. Kennedy and Kerry A. Trapp, **Kennedy Law Firm P.C.**, Woodbury, MN for Defendant.

Plaintiff African Economic Development Solutions ("AEDS") alleges that Defendant West Bend Mutual Insurance Company ("West Bend") violated the terms of an insurance policy (the "Policy") by denying AEDS's request for coverage for damage to their property caused by fire. *See generally* ECF No. 1 ¶¶ 1, 18. Both sides move for summary judgment as to whether the terms of the Policy covered the loss. ECF Nos. 23, 30, 35.[1] Because the Court concludes that West Bend is required to cover the damage under the terms of the Policy, the Court grants AEDS's motion for partial summary judgment and denies West Bend's motion.

---

[1]  Technically, AEDS seeks only partial summary judgment and, because the Court will grant that motion, the case moves forward solely on the question of damages.

# BACKGROUND

The relevant facts are undisputed. ECF No. 29. In January 2021, AEDS purchased a one-story commercial building (the "Property") in St. Paul, Minnesota. *Id.* ¶ 1. At the time of the purchase, the Property was vacant and "subject to an order from the St. Paul City Council to rehabilitate or raze the Property." *Id.* ¶ 2.

The parties entered an insurance contract for the property, *id.* ¶ 3, which covers all "direct physical loss unless the loss is excluded or limited in this policy," ECF No. 32-2 at 46. Relevant here, the Policy also contains a Minnesota-specific addition which further defines coverage to include "all loss or damage caused by fire and any damage caused by lightning." *Id.* at 58. Read together, then, the Policy covers all "direct physical loss" including "all loss or damage caused by fire and any damage caused by lightning" unless "the loss is excluded or limited in this policy." *Id.* at 46, 58.

To that end, the Policy includes a vacancy provision which provides that:

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

    (a) Vandalism;
    (b) Sprinkler leakage, unless you have protected the system against freezing;
    (c) Building glass breakage;
    (d) Water damage;
    (e) Theft; or
    (f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed . . . above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

2

*Id.* at 36. The Policy further contemplates several "Additional Coverage Extensions," which if purchased would cover more than just the Property. *Id.* at 54–55. For instance, AEDS could purchase extended coverage for "Property In Transit," meaning "personal property . . . in or on a motor vehicle you own" while "in transit more than 100 feet from" the Property, but which explicitly limited such coverage only to damage "caused by or result[ing] from . . . fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism"; a "[v]ehicle collision, upset or overturn"; or "[t]heft." *Id.* at 54. The Policy also defines "[s]pecified causes of loss" to include: "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; [and] water damage." *Id.* at 55.

On February 20, 2022, fire heavily damaged the Property. ECF No. 29 ¶ 5. The parties stipulate that the fire was "caused by an intentional human act" and that the Property was vacant at the time and had been for the previous 60 days. *Id.* ¶¶ 2, 5. AEDS thereafter submitted a timely claim for coverage, but West Bend denied the claim after determining that the vacancy provision applies. *Id.* ¶¶ 6–7. On February 14, 2024, AEDS brought this action seeking, in part, a declaratory judgment that the fire damage was covered under the Policy. ECF No. 1 at 5–6.

Both parties move for summary judgment. ECF Nos. 23, 30. West Bend asserts that an intentionally set fire constitutes vandalism, which is excluded from coverage under the vacancy provision. ECF No. 34 at 3. AEDS argues that the Policy is ambiguous as to

3

whether fire damage caused by a vandal is excluded under the Policy and that the Policy therefore should be construed in its favor. ECF No. 25 at 6.

## LEGAL ANALYSIS

Summary judgment is proper if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001) (citation omitted). The parties agree on all material facts and therefore agree that the only issue for summary judgment is a legal one: whether the Policy covers damage from an intentionally set fire. ECF No. 19 at 2; *see Am. Fam. Ins. Co. v. Walser,* 628 N.W.2d 605, 609 (Minn. 2001) ("Interpretation of an insurance policy and application of the policy to the facts in a case are questions of law . . . ."); *Midwest Fam. Mut. Ins. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) ("Because the facts are undisputed here, we decide whether either party is entitled to judgment as a matter of law.").

**I.   Principles of Interpreting Insurance Contracts**

Because the dispute concerns insurance coverage, the Court applies Minnesota state law. *See Wintermute v. Kan. Bankers Sur. Co.*, 630 F.3d 1063, 1067 (8th Cir. 2011). Minnesota courts have not squarely addressed the issue of whether an intentionally set fire constitutes "vandalism" in the context of a liability insurance policy, so the Court "must predict how the Supreme Court of Minnesota would rule, and [] follow decisions of the intermediate state court when they are the best evidence of Minnesota law." *Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) (citation omitted).

4

"When examining an insurance policy, a court's function is to 'determine what the agreement was and enforce it.'" *Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 648 (8th Cir. 2008) (quoting *Fillmore v. Iowa Nat'l Mut. Ins. Co.*, 344 N.W.2d 875, 877 (Minn. Ct. App. 1984); *accord Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997) ("In interpreting insurance contracts, [a court] must ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract."). "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). An insurance policy's terms "are to be interpreted according to both 'plain, ordinary sense' and 'what a reasonable person in the position of the insured would have understood the words to mean.'" *Farmers Home Mut. Ins. Co. v. Lill*, 332 N.W.2d 635, 637 (Minn. 1983) (quoting *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977)). But "exclusions are construed narrowly." *Walser*, 628 N.W.2d at 609; *see also SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn. 1995) ("Exclusions are narrowly interpreted against the insurer."), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009).

Further, any language that is unambiguous "must be given its plain and ordinary meaning." *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.,* 383 N.W.2d 645, 652 (Minn. 1986). But policy language that is ambiguous, meaning it is "susceptible to two or more reasonable interpretations," must be resolved in favor of the insured. *Wolters,* 831 N.W.2d at 636 (citations omitted). And courts "do not construe individual words or phrases in insurance policies in isolation. Rather, when determining if an

ambiguity truly exists [courts] read the policy as a whole" and interpret a phrase "in light of its place within a liability insurance policy." *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 706–07 (Minn. 2013).

## II. Fire Damage Covered Based on Application of Interpretation Principles and Relevant Case Law

This case turns exclusively on whether damage caused by an intentionally set fire constitutes damage caused by "vandalism." If so, the vacancy provision applies. If not, and the damage is more appropriately characterized as damage caused by "fire," the vacancy provision does not apply.

There is a large body of case law on this precise question developed by courts interpreting nearly identical contractual provisions. The cases ultimately fall into one of two groups. The first considers policies, like the one here, that: (1) specifically covered fire damage; (2) contained a vacancy provision which excluded coverage for damage caused by "vandalism"; and (3) differentiated between those types of damage throughout the policy. *See, e.g.*, *Wells Fargo Bank, N.A. v. Allstate Ins. Co.*, 290 F. Supp. 3d 715, 719–20 (N.D. Ohio 2017) (collecting cases in which "courts have found that an exclusion for vandalism and/or malicious mischief does not encompass arson, particularly where the policy distinguishes between arson and vandalism and/or malicious mischief"); *R & J Dev. Co. v. Travelers Prop. Cas. Co. of Am.*, No. 11-cv-47-ART, 2012 WL 1598088, at *3 & n.1 (E.D. Ky. May 7, 2012) (same). Courts considering these policies "agree either that 'vandalism' unambiguously excludes arson or that the term is ambiguous and must be construed against the insurer," thus rendering such vacancy exclusions inapplicable. *R & J*

6

*Dev. Co.*, 2012 WL 1598088, at *3. The second group consists of policies that "did not enumerate or otherwise distinguish among causes of loss like 'fire' and 'vandalism.'" *Id.* at *3 & n.2 (collecting cases). Courts considering these policies interpret vandalism to include arson and deny coverage accordingly. *Id.*

The Court sees no reason to diverge from this well-reasoned distinction. West Bend urges the Court to find that the Policy, which falls squarely into the first group above, should nonetheless be analyzed as one falling into the second group. *See* ECF No. 41 at 7–11. At first blush, West Bend's plain-language argument seems persuasive. Black's Law Dictionary defines "vandalism" as the "[w]illful or ignorant destruction of public or private property," *Vandalism*, Black's Law Dictionary (12th ed. 2024). "Arson" is defined as "intentionally or recklessly destroying or damaging property by setting fire to it," *Arson*, Black's Law Dictionary (12th ed. 2024). As West Bend notes, there is substantial overlap between those two definitions because "[i]f vandalism is, at bottom, the intentional destruction of property, arson seems like one (particularly pernicious) way to accomplish that objective." *Wells Fargo Bank, N.A. v. Allstate Ins. Co.,* 784 F. App'x 401, 404 (6th Cir. 2019). Consequently, looking no further than the terms themselves—as West Bend urges the Court to do, ECF No. 34 at 5–8—it would seem logical to conclude that damage from an intentionally set fire—that is, "arson"—is damage from "vandalism." Then the damage to the Property is not covered.

But "[p]rovisions in an insurance policy are to be interpreted according to both 'plain, ordinary sense' and 'what a reasonable person in the position of the insured would have understood the words to mean.'" *Lill*, 332 N.W.2d at 637 (citation omitted). The

7

Court therefore may not read "individual words or phrases in [the Policy] in isolation" but rather must read them "in light of [their] place within [the Policy]." *Eng'g & Constr. Innovations*, 825 N.W.2d at 706–07.

Considering the Policy in its entirety, the otherwise clear language of the individual terms gives way to ambiguity. Notably, the Policy refers to damage from fire and damage from vandalism separately in at least three different places. First, in the very vacancy provision at issue here, the Policy expressly lists excludable damages such as those caused by vandalism, sprinkler leakage, building glass breakage, water damage, theft, or attempted theft. ECF No. 32-2 at 36. But the Policy immediately thereafter states that "[w]ith respect to Covered Causes of Loss *other than those listed* . . . we will reduce the amount we would otherwise pay for the loss or damage by 15%." *Id.* (emphasis added). And as noted, the Policy defined "covered causes of loss" to explicitly include loss by fire. *Id.* at 46, 58. Therefore, the vacancy provision could reasonably be interpreted as distinguishing between vandalism damage and fire damage because the fire damage is a "covered cause of loss" not listed explicitly in the vacancy provision.

Second, the Policy provides for "additional coverage" extensions, including an option to cover "Property In Transit." *Id.* at 54. That extension, as relevant here, covers "loss or damage" to such property that is "caused by . . . *fire*, lightning, explosion, windstorm or hail, riot or civil commotion, or *vandalism*." *Id.* (emphasis added). In other words, damage by fire and damage by vandalism are contemplated as distinct forms of damage. Otherwise, the inclusion of fire would be redundant or surplusage. The Court must read the Policy holistically and give all terms effect. *Network F.O.B., Inc. v. Great*

8

*Am. Ins. Co. of New York*, 30 F. Supp. 3d 831, 834 (D. Minn. 2014) (citation omitted) (noting that under Minnesota law "[e]ach word in the Policy should be interpreted to have a meaning, rather than to be redundant or superfluous").

Third, the Policy explicitly defines "[s]pecified causes of loss" to include "*fire*; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; *vandalism*; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." *Id.* at 55 (emphasis added). Though the phrase is not incorporated into the vacancy provision specifically, it is nevertheless an indication that a reasonable person would read the Policy and consider vandalism damage to be distinct from fire damage.

All in, the repeated and clear separation of vandalism and fire damage in the Policy creates ambiguity. *See, e.g.*, *United Cap. Corp. v. Travelers Indem. Co. of Ill.*, 237 F. Supp. 2d 270, 277 (E.D.N.Y. 2002) ("The listing of both 'Fire' and 'Vandalism' as 'Covered Causes of Loss' and 'Specified Causes of Loss' is found throughout the Policy and creates ambiguity in the entire Policy."); *Nationwide Mut. Fire Ins. Co. v. Nationwide Furniture, Inc.*, 932 F. Supp. 655, 657 (E.D. Pa. 1996) ("Because fire and vandalism are listed in the policy as separate causes of loss, we conclude that at best the word vandalism is ambiguous. . . . [W]e interpret the policy to provide coverage when fire damages a vacant building even though vandals may have set the blaze.").

Further, courts "rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal

9

quotation marks omitted) (citation omitted). Here, the vacancy provision lists five other causes of damage—sprinkler leakage, building glass breakage, water damage, and theft or attempted theft—which suggest that vandalism damage is a relatively minor type of damage, like the kind one might expect to be caused by vagrants frequenting an abandoned building—not from catastrophic fire. *See United Cap. Corp.*, 237 F. Supp. 2d at 276–77 ("The Court also notes that the other excluded 'Covered Causes of Loss' in the Vacancy Exclusion relate to less catastrophic losses, such as theft and attempted theft."); *Owners Ins. Co. v. White*, No. 2:12-cv-00233-WCO, 2014 WL 12461045, at *10 (N.D. Ga. Jan. 23, 2014) ("The vacancy exclusion precludes property damage for damage caused by vandalism, sprinkler leakage, building glass breakage, theft, and attempted theft. One word immediately comes to mind when examining whether these words share a common element: petty.").

In short, like the many courts that have previously considered the question, this Court finds it ambiguous, at best, as to whether damage caused by an intentionally set fire constitutes "fire" damage or "vandalism" damage. Indeed, the Court agrees with much of the rationale provided by the Sixth Circuit in *Wells Fargo Bank*. Like the Policy here, the policy at issue in *Wells Fargo Bank* included a vacancy provision that allowed the insurer to deny coverage for loss by "vandalism or malicious mischief" but distinguished losses from fire and losses from vandalism in other areas. 784 F. App'x at 402. The Sixth Circuit acknowledged that arson as defined by a dictionary could be considered a form of vandalism but declined to decide the case "on the words alone," in part because it thought "one would describe arson as vandalism about as regularly as one would call murder a

battery—which is to say almost never." *Id.* at 404. The court then considered the totality of the policy, finding particularly illustrative a section which listed "fire loss separately from loss caused by vandalism," because "if 'vandalism or malicious mischief' doesn't encompass all fires in one section of the policy, it cannot capture all fires in another section of the policy." *Id.* The policy, therefore, presented "two potential landing spots for arson," and in so doing created ambiguity that had to be construed in favor of the insured. *Id.* at 404–05.

The Court is also persuaded by the analysis of an identical contract in *Nationwide Furniture*, 932 F. Supp. at 656, out of the Eastern District of Pennsylvania. The vacancy exclusion at issue in that case was identical to the one here, and the policy there similarly defined "Specified Causes of Loss" in a way that distinguished fire and vandalism. *Id.* at 656. The court concluded that "at best the word vandalism is ambiguous" because "fire and vandalism [were] listed in the policy as separate causes of loss," despite any overlap between the definitions of those words in isolation. *Id.* at 657.

The cases cited by West Bend are easily distinguishable because they fall into the second group identified above: policies which did not differentiate between fire and vandalism. *See R & J Dev. Co*, 2012 WL 1598088, at *3 & n.2 (collecting and analyzing every case cited by West Bend and noting that those policies "did not enumerate or otherwise distinguish among causes of loss like 'fire' and 'vandalism'"). The analysis in those cases ends with the plain language of the term vandalism because without the contract itself differentiating between fire damage and vandalism damage, there was no ambiguity to resolve. *See, e.g.*, *Estes v. St. Paul Fire & Marine Ins. Co.*, 45 F. Supp. 2d. 1227, 1229

11

(D. Kan. 1999) (finding no ambiguity in insurance policy where the policy's "vandalism exclusion" made no reference to "arson," and concluding "[a]rson of a private [building] clearly is within the plain and ordinary meaning of vandalism").

Finally, the Court notes that had West Bend, the drafter of the Policy, intended for vandalism damage to include damage from an intentionally set fire here, it could have done so. *See, e.g.*, *United Cap. Corp.*, 237 F. Supp. 2d at 276 ("As the drafter of the Policy, Defendant could have clearly excluded coverage for the fire at issue by defining 'Vandalism' in the Policy to include arson, or conversely, to define 'Fire' as accidental fires only."); *Wells Fargo Bank, N.A.* 784 F. App'x at 405–06 ("[T]he fact that arson carries the most destructive potential of any purported act of vandalism only makes it *more* confounding that the policy does not more explicitly account for it."); *Nationwide Furniture*, 932 F. Supp. at 657 ("If Nationwide Insurance had wished the result to be otherwise, it could easily have defined vandalism to include non-accidental fires. It also could have added fire or at least intentionally ignited fire to the list of causes for which no payment would be made for damage to an unoccupied building.").[2] In fact, given the

---

[2] West Bend also could have excluded *all* damage caused to a property during vacancy. Indeed, West Bend cites Minnesota's "Standard Fire Insurance Policy," Minn. Stat. § 65A.01, which, if incorporated into an insurance contract, provides that an insurer will not be liable for *any* loss occurring during vacancy. But West Bend acknowledges that it *did not* adopt such language in this Policy. ECF No. 41 at 5–6. Short of such clear language, it strains logic to presume that AEDS would have purchased the Policy believing that it did not cover catastrophic loss from arson because the Property was already vacant when AEDS entered the contract with West Bend. *Farmers Home Mut. Ins. Co.*, 332 N.W.2d at 637 (quotation omitted) (noting that an insurance policy's terms "are to be interpreted according to . . . what a reasonable person in the position of the insured would have understood the words to mean").

overwhelming consensus of courts addressing a similar insurance contract—which has spanned the last nearly 30 years—the Court notes that West Bend has been, or at least should have been, on notice of its potential liability exposure for decades.

Given that the Policy is ambiguous, and because all ambiguities must be construed in favor of the insured and exclusions construed narrowly, the Court grants AEDS's motion for summary judgment.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment (ECF No. 23), is **GRANTED**; and

2. Defendant's Motion for Summary Judgment (ECF Nos. 30, 35) is **DENIED**.

Dated: June 11, 2025

*s/Laura M. Provinzino*
Laura M. Provinzino
United States District Judge